24-1407. Thank you. Good morning, Mr. Min. Good morning. May it please the Court, my name is Richard Min. I represent the appellant Maria Elena Sweat Urquieta on this action that was filed pursuant to the Hagan Mention on international parental child abduction seeking the return of the minor child to Chile. I've reserved two minutes for a rebuttal. First, the district court misapplied the law in several regards, especially by improperly making custody determinations in this case. There's bound to be some overlap in that because one of the exceptions is the views of the child, assuming a degree of maturity, and if the motion is adopted, the application is to be made within a year. And so wouldn't that be part of the, wouldn't that necessarily get into kind of the same discussion you would have with regard to custody in some respect? In some limited respects, yes, but what the court focused on here was essentially a parental preference. The child preferred to live with the father. Many of the concerns the child raised stemmed from the fact that the child did not want to live with the mother. Right, but the district judge also found that the child had problems in Chile and his schooling down there and his friends and all of the various aspects of his life down there independently of what might have been a preference for his father, which could have been a proxy for not wanting to be in Chile. Well, three responses to that, Your Honor. First, it's difficult to separate what the child expressed with the undue influence that the father exerted on the child throughout the child's life, or at least in the last couple of years. Second, the court also, in the same decision, found that the child had exaggerated some of the complaints in Chile when dismissing or denying the grave risk of harm defense, right? In other words, the district judge considered really every aspect of this case, it seems to me, in a very deep and thorough opinion and came to the conclusion that keeping the child here was appropriate under two of the exceptions. And so where did the district I'm having trouble with where the district court went wrong. It may be that the district court had certain emphases that the district court made that you disagree with, but in terms of its decision, I'm just having trouble with where the court acted improperly. Understood, Judge Walker. I think the first mistake was on the finding of undue influence or the finding that there was no undue influence from the actions of the father. I mean, I think clearly here, you look at the case law and every single factor that the cases have previously found where there is undue influence exists in this case. The father has Just to be clear, that's a factual determination that we'd be reviewing for clear error, right? That is, yes, Your Honor. But again, we agree that, you know, a clear error occurs when there's a firm conviction that a mistake was made. In this case, if you look at every single factor that prior courts have looked at to find undue influence, and this court has those factors in front of it and finds the opposite, to me, that's a mistake. There's no alternate theory or alternate conclusion that a court could have reached when looking at the facts in this case, the facts that the court agreed with. But the ultimate conclusion that the court drew from those facts was that there was no undue influence, mostly because the court relied on its finding that the child expressed some unhappiness or some possible desire to leave Chile in June 2022 before the proof or evidence of undue influence started on July 1st, 2022. What is it that Judge Engelmeyer missed in the record? Well, first, there really was... Because he had the e-mails. He had the message, rather. He had the correspondence between the father and the child, which is the basic premise for this claim, I think, of undue influence. Is that right? Well, the e-mails are a big part of it, but you also look at what happened after the hearing. The child admitted that the father was talking to him about the litigation, talking about the financial ramifications of the litigation, talking to him about the settlement offers were made during the course of litigation. The father was cooperating with the child to record the mother's conversations, frankly, to be used in litigation. But the district court knew all this and took it all into account and gave full expression to what you're arguing in his opinion and then came to the conclusion, a different conclusion, and I think largely based upon the fact that he had personally interviewed the child in camera and just the two of them for considerable time. Yes. Your Honor, it was a 102-page decision. I certainly concede that Judge Engelmeyer reviewed all the facts and came to the conclusions that he came to. However, on the issue of undue influence, the judge relied upon the fact that the child had a preference prior to the undue influence in July 2022. And the reliance on that is a testimony from a family member that said the child wanted to leave Chile, that the child himself refuted in the in-camera interview. The other fact that the court relied on was the fact that the child complained about Sundays, Monday, Tuesdays in Chile to the father after the father wrote to the child talking to the child about how Sundays were difficult. These were not strong expressions that the child disliked life in Chile. Again, the judge focused on a four- to six-month period of unhappiness in Chile. Is that sufficient basis for a child to object or not want to return home, especially when the father stoked those flames and influenced the child to continue to have negative feelings about Chile and or his mother? Now, the judge asked the child's therapist on the stand, Dr. Addy, well, didn't the father's messages and communications prevent or possibly prevent the child from recovering or from having an optimistic view of the child's life in Chile? The question still remains. The child may have expressed some unhappiness in June, but the father then, for the next six months, stoked those flames and exacerbated the child's complaints about Chile and his mother. And you cannot... Even if that's right, I mean, aren't you then, I mean, punishing the child for the father's misconduct and kind of stoking those flames? Well, I disagree, because there's relief to be had, which is a custody dispute in Chile. And the father wrote in an email, the custody case in Chile will take too long. And that's why he did not file one. But that is the proper recourse, not to engage in self-help, not to poison your own child, which certainly isn't what's in the child's best interest, for a father to be in Chile and dislike his own mother. Just so I can focus on this particular point, you're arguing the clear error here was that the portion of time when the child expressed his views before the father's undue influence was dubious testimony, based on dubious testimony. Is that why it was error for Judge Engelbart to rely on that? Yes. The family member testifying the child said he wanted to leave and the child's refuting that testimony, saying he never told any family members that. That is a clear error. And then also the fact that there was undue influence. I think one remaining point on this is the court relying on the child's statements in the summer of 2022, instead of whether there was undue influence at the time of the trial is clear error. In the Avendendo case, the First Circuit rejected the mother's contention that the opinions of the child should be considered retrospectively. It's the opinions of the child and the undue influence of that opinion at the time of trial that should be assessed. And that's not what the Court did here. Your Honors, I know I'm running out of time, so I want to move on to the court's case this year. Another clear error that the Court made, Enrique Cabrera, 323 F. Sub. 2nd. 1303 out of the Southern District of Florida. In that case, the child traveled to the United States with a travel authorization and was supposed to return March 2002. In that case, the child did not return. The father then asked for permission to keep the child for an additional school year, threatening that if the mother did not give permission, him and the child would get lost, meaning disappear. The mother gave her permission. Then at trial, the father said the date of wrongful detention is March 2002, when I was originally supposed to go back. The Court rejected that and said, no, you guys came to a different arrangement. And so, therefore, the date of wrongful detention is June 20, 2003. So there was no wrongful detention in January? Is that your point? That is our point, Your Honor. And yet she went and reported it to the police two days later. But the Court found that she did not follow through with that and did not take legal action. The Southern District of Florida mentioned that Petitioner sought to resolve the situation without resorting to the hate convention. That is what Ms. Mehta did. She filed a police report to document it. She did not follow through with that. And that's what the Court found. On January 8, the father wrote her saying, I suggest we all calm down and you let the child stay here until the end of February. Have we ever, that is this circuit, ever dealt with the question of whether and to what extent the left-behind parent, your client, can extend this one-year period after wrongful, you call it detention, retention has actually happened? No. We have not found any cases in this circuit. Judge Engelmeyer also noted that there were no cases cited to that effect. This case in the Southern District of Florida is actually the only case I was able to find. And why? Just help me because this is not my area of expertise. Not that I have an area of expertise, but this is definitely not it. Why would that be? Because I would imagine that this happens quite often where there is a wrongful, unacknowledged in this case, wrongful retention, and then there is some communication between the parents that might lead to this question. I can only surmise that perhaps if they are able to come to a resolution after the wrongful retention, perhaps they don't need court intervention in the future and they are able to resolve their disputes. Is that because the longer there is a period of time before the left-behind parent takes action, the less force the application of the convention has because the idea of the convention is immediate return and then a custody dispute in the home country. So then it becomes less of a concern to have the child go back. Well, I mean, I think that's what the Article 12 well-settled exception is for. I mean, there's no other exception or there's no other consideration the courts make as long as the litigation is filed within the year of the wrongful retention. The question here is what is the operable date? Now, before this litigation started, both parties seemingly agreed the date of wrongful retention was the end of February. He filed a family court petition in New York saying that the parties discussed February 26th. My client filed a Hague application with the Chilean Central Authority in late 2023 stating that the end of February was the date of wrongful retention. This was before they had any skin in the game to say it was January 8th, February 26th. Before they had any motivation, they both agreed that the end of February was the date of wrongful retention. He asked her on January 8th essentially for permission to let him stay. She gave that permission. Whether it was reluctant, like in the Cabrera case, it does not matter. The fact of the matter is she's the rights holder. She's the one with the custody rights. It is her consent to give, begrudgingly or not, it is her consent to give, and she gave it. And therefore, when the child was not returned on February 26th, as she wrote in her e-mail, that is when I want the child returned, that is the operable date of wrongful retention. And each time she were to do that, that would reset the clock in your view? I mean, in theory, yes. But the problem that she would have is that if you continuously reset the clock, one could argue habitual residence can change because habitual residence is defined as immediately before the wrongful retention. So let's just say she said, okay, I'll give you another six months. I'll give you another six months. Eventually, the father would argue, I presume, hey, you've given me two years, now the habitual residence is U.S. So there's clearly a disincentive if you're looking at it from a litigation strategy to continuously give extensions. But also, there should be an incentive for parties to try to come to alternate arrangements instead of resorting to litigation. And here, she did that. She filed a police report. She did not follow through because she did not want to litigate this issue. So she agreed to the extension. Maybe it was reluctant. Maybe she felt like, you know, he's going to keep the kid anyway. But she did it. And that's all that matters. And the court assigning different standards for whether or not she begrudgingly acceded to that is irrelevant to the question. She holds the custody rights here. It's up to her to decide how long the child stays in the U.S. And she did decide that. If there are no further questions, I'll reserve my two minutes. Thank you very much. Good morning. Good morning, Your Honors, and may it please the Court. Karen King from Marilla Abramovitz on behalf of the Respondent, Appellee Mr. Bowe. There are obviously two affirmative defenses at issue on this appeal. Each of them was an independent basis for the district court to deny the petition, and each of them provides an independent basis for affirmation of that decision. Both of them, however, turn fundamentally on factual findings, something the panel has already asked about. And the fact finder here was extraordinary. I don't know if you can see it, but there's a robust record of 13 volumes showing a thorough, diligent and thoughtful process, two weeks of trial culminating in 102 pages of opinion that walks through the evidence in meticulous detail. Judge Engelmeyer did not miss anything. It's just that the litigants may not agree with all of the district court's findings. But again, the best person to make those findings is the fact finder, the judge that's sitting there in the room. And this court has repeatedly observed, including in two hate cases this year, that would be the Terraschenko case and the Lamonto case, that a trial court's findings must be accepted unless we are definitive and firmly convicted that a mistake has been committed. And respectfully, we don't think that this is anywhere close to that high standard here. On the first question, the Article 12 mature child exception, the issue is whether or not the child is of sufficient age and maturity that his preferences should be considered. The maturity of the child and his true, genuine preferences are both fact issues that Judge Engelmeyer, the district court, considered in detail. On appeal, maturity is not even disputed. All of the witnesses that spoke to this issue, including the mother herself, spoke to the extraordinary maturity of this child, his intelligence, his honesty, his proposals. As I understand it, your friend's argument is focused on the period before the father's influence where it's somewhat controverted, whether he said that he expressed his unhappiness about being in Chile and there's some contrary testimony. Can you just speak to that? Yes, of course. The district court examined the consistency of SBS's convictions and opinions across time, including the period of time before the e-mails that the mother keeps pointing out. And the consistent testimony was that he disliked Chile, not his entire life, but certainly... Where is that in the opinion? When you say that Judge Engelmeyer specifically examined the consistency over time... On Special Appendix 46, the quote "...the consistency and clarity of SBS's objections to returning to Chile underscore that these are sincere, firmly held and anchored in reason." The district court went on to say that in the main, SBS was sensible, well-analyzed, grounded in experience, was an astute and observant child who has come to his views based on reflection. This is at Special Appendix 58. And then I think the best one is at Special Appendix 53, where the district court observes that SBS's assembled communications over time to a diverse array of persons, Chileans and Americans, kin and strangers, teachers and therapists, a lawyer and a judge, leave the court with zero doubt about the durability and strength of his objection to return to Chile. This is at Special Appendix 53. We acknowledge that there are lots of emails. Some of them are not reflecting parents at their best. There are angry statements in the record. But the district court considered all of that, acknowledged, criticized some of those communications, but also acknowledged that they are merely one piece of a much broader record showing, you know, affirmative and positive communications as well. And ultimately, after questioning SBS himself in chambers, came to the conclusion that SBS's genuine opinions and firmly held beliefs were his own. And it is not for the mother to come here on appeal and to say, I know better what this mature, intelligent and honest child really wants and that her opinion should replace both the child's stated views, both directly to the judge as well as through independent counsel, and that that opinion should somehow replace the child's own articulation of his desires. And, again, this comes down to a factual question that is best handled by the fact finder in this case, a very meticulous fact finder with a 102-page opinion. Just turning briefly to the second issue, this is the Article 12 one-year unsettled defense. The legal standard here... Let me just stop you there with respect to the second issue. You started off by saying that each of the judge's resolutions, Judge Engelmeyer's resolutions of this case on separate issues is an independent reason to affirm. But if we were to disagree with his resolution, just when the time is triggered with respect to wrongful retention, which I don't think that there's any disagreement that it was an initial wrongful retention, then would that not be a reason to remand because that then implicates the existence or non-existence of a well-settled defense? Is that right? The one-year time frame does implicate the well-settled defense, but separately there's the Article 13 defense that if the child is of an age immaturity that his opinion should be considered, that can be an independent basis for denying the petition. So just because there might be a legal question left open, which we don't think, but if you thought that there was a legal question open on the Article 12 defense, still Article 13 itself is an independent reason that the district court had to deny the petition and would also justify an affirmance of the final result here. So just turn to the one-year and settle that. We don't think that there really is much room for this debate on this defense either because the act of wrongful retention has to be pinpointed to a single date. The district court found that that was January 8th. That is well-supported by much of the evidence. There was a notarized travel authorization that expired on January 8th. There's correspondence that happened before and on January 8th protesting the fact that the child was not returned. There was a request for an extension before January 8th, which was firmly rejected and said to be a final decision of the mother to reject that extension request. Ms. Sweat filed a police report two days later complaining that the child had not been returned. Hypothetically, what happens in a situation where there's a firm date for return, such as there was here, and then later on there's a notarized agreement to do it at a later time, and then hypothetically, and maybe even if that deadline is missed, yet another agreement to do it at a later time. Which is the output of date? If the parties come to an agreement to extend or change the date, then the later date... And that could be done before or after the first date? Well, I think the last agreement between the parties should govern in terms of what the consent is. But you're saying there was no agreement? There was no agreement here other than the January 8th date, which was violated. That's the date of wrongful retention. That's what the district court found. And as I said, there's a lot of support for that. There's a cherry picking of some ambiguity in this email or that. But the district court meticulously walked through the competing evidence on both sides on this very important issue and concluded that January 8th was the proper date. And although the district court did acknowledge that conceptually you could have acquiescence or consent by the agreed to parent, that based, and this is a quote, based, but on the facts of this case, Sweatt's capitulation to Bose Retention and non-return of SBS after January 8th cannot be found to meet any possible standard of acquiescence or consent. This is at Special Appendix 67 and 68. So the evidence was considered by the fact finder. It was ultimately rejected by the fact finder. And we are here today to ask you to affirm that very careful finding that January 8th was the operative date. The petition was not filed within a year of that date. There's really no explanation. There's some sort of lawyer speculation after the fact. But there was no explanation for why she didn't show up. She had a U.S. lawyer. She still didn't file the complaint. And she waited. And as a result of that, well settled and the settlement of the child is properly considered. And I don't think there can be any dispute that this child was very settled in the United States. The district court had 10 pages of this opinion devoted to the overwhelming evidence that the child is thriving in New York. So because the factual issues here were thoroughly litigated and resolved by the fact finder, those findings on both of these defenses was clearly rational, supported by ample evidence. There is no clear error and the decision below should be affirmed. Thank you. Thank you, Mr. Min. Thank you, Your Honor. I want to address the question of possible remand. I agree that if the court finds that the operable date of wrongful retention is February 26th, that would preclude a well settled defense, Article 12 well settled defense, which would leave only the Article 13 mature age exception available. Now, retired Judge Garbolino, who wrote the federal judicial center guidebook on hate convention jurisprudence, wrote that when the mature child's objection to return is the only reason for denying repatriation and is not part of a broader analysis of the evidence such as grave risk, the court must use a stricter standard for the application of this defense, which would mean that this court should remand back to the court with further instructions to reexamine the mature age exception in light of the fact that it would be the only available defense or exception available to respond in at the time. If the underlying district court's opinion had been 15 slapdash pages, I could certainly understand that. But you'd be asking the court to go back and redo what the court has already done. I mean, a very thorough investigation of that question on the maturity. So it's hard to see why that would be necessary to remand on that. Again, of course, we are not contesting the maturity and the age of the child. What we're contesting is whether or not the child's views, which number one, we do not believe were particularized objections that are consistent with the jurisprudence, nor do we think that it was free from undue influence. In terms of particularized objections, the courts across the country have agreed, and I will admit that there are cases that go the other way, that things like school preference or the lack of friends are not proper objections to consider because that treads into custody waters. As I repeated before, this child experienced some level of sadness, and if I may have a few moments in addition. A few months of sadness, loneliness in Chile after his mother returned from work post-COVID pandemic. To take a few months of a child's life as a snapshot of unhappiness that the father, again, stoked the flames of, and to say the father should not have simply just gone into the Chilean courts, asked for relocation or asked for custody, usurps the role of the Chilean courts and expands the definition and the role of this court in a hate convention case. That's not what this court should do. It should not look to which parent the child prefers, which school the child prefers, which group of friends the child prefers. That is in the realm of a custody dispute. I'm not sure that that's what Jorgen Romero Meyer did. So he did much more than that. And, you know, you're asking us to assign error. I'd like you to answer or respond to the argument that any one of these defenses on appeal, if the father prevails, we should affirm. Is that correct? I concede that it is possible and that any one exception would can defeat the petition. But as I stated before, when used alone, the mature age exception should be held to a stricter standard if not accompanied by other exceptions. The stricter standard review you quoted from the judge who wrote a manual on this. Are there cases that talk about that? He did not cite any cases in his commentary. And you haven't found any? No. Okay. Thank you. Thank you very much. We will reserve the decision.